# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 8
Margaret Doe,
        Appellant,
    v.
Bloomberg, L.P., et al.,
        Defendants,
Michael Bloomberg,
        Respondent.

Niall Macgiollabhuí, for appellant.
Elise M. Bloom, for respondent.
National Employment Lawyers Association-New York, Partnership for New York City, amici curiae.

GARCIA, J.:

Plaintiff, an employee of Bloomberg L.P. using the pseudonym "Margaret Doe," brought suit against defendants Bloomberg L.P., her supervisor Nicholas Ferris, and Michael Bloomberg, asserting several causes of action arising from alleged discrimination,

- 1 -

sexual harassment, and sexual abuse. The question before us is whether Bloomberg, in addition to Bloomberg L.P., may be held vicariously liable as an employer under the New York City Human Rights Law (Administrative Code of City of NY, title 8 [City HRL]) based on his status as "owner" and officer of the company. We hold that Bloomberg is not an "employer" within the meaning of the City HRL and accordingly, we affirm the dismissal of plaintiff's claims that seek to hold Bloomberg vicariously liable for Ferris's offending conduct.

I.

Plaintiff's complaint asserted various causes of action, including sex discrimination and hostile work environment claims under the City HRL.[1] Plaintiff alleged that Ferris, her direct supervisor at Bloomberg L.P., engaged in a continuous pattern of sexual harassment, including rape. She alleged that Bloomberg, in addition to Bloomberg L.P., was her "employer" and as a result was subject to vicarious liability under the City HRL. Plaintiff asserted that "[a]t all relevant times" Bloomberg was the "Co-Founder, Chief Executive Officer, and President of Bloomberg[ L.P.]," and that he had fostered an environment that accepted and encouraged "sexist and sexually-charged behavior." She does not claim that Bloomberg had any "personal participation" in the specific offending conduct.

---

[1] Plaintiff also sued Bloomberg for aiding and abetting sex discrimination and negligent infliction of emotional distress. Those claims, along with the remaining claims against Bloomberg L.P. and Ferris, are not at issue here.

Bloomberg moved to dismiss the claims against him. Supreme Court, after first granting the motion to dismiss, granted reargument and denied the motion. The Appellate Division, with two Justices dissenting, reversed and dismissed the causes of action against Bloomberg (178 AD3d 44 [1st Dept 2019]). Plaintiff appealed to this Court as of right pursuant to CPLR 5601 (a).

## II.

"When reviewing a defendant's motion to dismiss a complaint for failure to state a cause of action, a court must give the complaint a liberal construction, accept the allegations as true and provide plaintiffs with the benefit of every favorable inference" (*Cortlandt St. Recovery Corp. v Bonderman*, 31 NY3d 30, 38 [2018] [internal quotation marks omitted]). The ultimate question is whether, accepting the allegations and affording these inferences, "plaintiff can succeed upon any reasonable view of the facts stated" (*Aristy-Farer v State of New York*, 29 NY3d 501, 509 [2017] [internal quotation marks omitted]). Applying this standard, we conclude that the claims against Bloomberg must be dismissed, but our reasoning differs from that of the courts below.

## A.

The City HRL makes it unlawful for "an employer or an employee or agent thereof" to discriminate on the basis of gender (Administrative Code of City of NY § 8-107 [1] [a]). The statute also prohibits "any person" from aiding and abetting discrimination (*id.* § 8-107 [6]) or from retaliating against another person for engaging in certain protected activities (*id.* § 8-107 [7]).

In addition, the City HRL imposes vicarious liability on employers in the following circumstances:

> "An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:
>
> "(1) the employee or agent exercised managerial or supervisory responsibility; or
>
> "(2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or
>
> "(3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct" (Administrative Code of City of NY § 8-107 [13] [b]).

The statute is clear as to when an employer is liable: for the employer's own offending conduct and vicariously for some actions of others. But the term "employer" is undefined, generating confusion as courts have endeavored to determine who is an employer in the context of the extensive—and at times strict—liability imposed.

B.

We do not find persuasive the analysis adopted by the Appellate Division majority. That court held that "some participation in the specific conduct committed against the plaintiff is required to hold an individual owner or officer of a corporate employer personally liable in his or her capacity as an employer" (178 AD3d at 50). Because plaintiff failed to allege that Bloomberg "encouraged, condoned or approved of the specific

discriminatory conduct allegedly committed by Ferris," the court dismissed the complaint against Bloomberg (*id*. at 50, 52).

The Appellate Division majority's test is derived from our case law interpreting the New York State Human Rights Law (Executive Law art 15 [State HRL]). In *Matter of Totem Taxi v New York State Human Rights Appeal Bd.*, we held that a common carrier or place of public accommodation, like a typical private employer, could not be held liable under the State HRL for an employee's discriminatory act "unless the employer became a party to it by encouraging, condoning, or approving it" (65 NY2d 300, 305 [1985]; *see also Matter of State Div. of Human Rights v St. Elizabeth's Hosp.*, 66 NY2d 684, 687 [1985]; *Hart v Sullivan*, 84 AD2d 865, 866 [3d Dept 1981], *affd* 55 NY2d 1011 [1982]). In *Totem Taxi*, the Court was not considering who was an employer under the State HRL—it was the corporation that employed the driver who engaged in offensive conduct. Rather, the issue was whether, under that statute, the corporate employer could be liable under a respondeat superior theory for the acts of an employee. Concluding that the State HRL did not impose vicarious liability on employers, the Court held that only an employer who "became a party to" the discriminatory act could be held liable (*Totem Taxi*, 65 NY2d at 305 [statute did not provide "that a person who employs one who commits a discriminatory act is also guilty of a violation irrespective of fault"]). By contrast, this Court held in *Zakrzewska v New School* that City HRL section 8-107 (13) (b) (1), unlike any provision in the State HRL, is a vicarious liability provision which imposes strict liability on an employer—the employer need not have "participated" in the offending conduct (14 NY3d 469, 480-481 [2010]). Accordingly, in *Zakrzewska*, we made clear that the State HRL's

minimum culpability standard was irrelevant to assessing whether an employer is liable under this provision of the City HRL (*id.* at 481 ["we may not apply cases under the State Human Rights Law imposing liability only where the employer encourages, condones or approves the unlawful discriminatory acts"]).

Nonetheless, some courts have applied the State HRL's culpability standard to determine whether individuals are employers under the City HRL because of their relationship to the business entity employing the perpetrator of the offending conduct (*see Boyce v Gumley-Haft, Inc.*, 82 AD3d 491, 492 [1st Dept 2011] [defendant who was the 50% owner of an LLC with the power to hire and fire employees, could be held liable as an employer under section 8-107 (13) (b) provided that "he encouraged, condoned or approved (the) alleged discriminatory conduct"]; *McRedmond v Sutton Place Rest. & Bar, Inc.*, 95 AD3d 671, 673 [1st Dept 2012] [the general manager of a restaurant "can be held liable (under the State HRL) as an employer if, as the record suggests, he had the authority to do more than carry out personnel decisions and he . . . participated in the conduct (and) (f)or the same reasons, (he) may also be held liable under the City HRL"]). However, the *Totem Taxi* test for determining *whether* an employer is liable under the State HRL has no application in determining *who* is an employer for purposes of the City HRL.

The test proposed by the dissent below, purportedly drawn from our decision in *Patrowich v Chemical Bank* (63 NY2d 541 [1984]), is even less suitable. According to the dissent an individual qualifies as an employer under the City HRL when shown to have either (1) an ownership interest in the organization or (2) the power to do more than carry

out personnel decisions made by others (*Doe*, 178 AD3d at 53 [Manzanet-Daniels, J., dissenting]).  This is a misreading of *Patrowich*.

In *Patrowich*, the Court considered whether a corporate officer or employee could be an "employer" subject to liability under the State HRL and Labor Law, as well as under two federal statutes:

> "A corporate employee, though he has a title as an officer and is the manager or supervisor of a corporate division, is not individually subject to suit with respect to discrimination based on age or sex under New York's Human Rights Law or its Labor Law or under the Federal Age Discrimination in Employment Act or Equal Pay Act if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others" (63 NY2d at 542 [citations omitted]).

The dissent below, the dissent here, and a number of other courts, misinterpret *Patrowich* as making the "ownership/personnel decisions" test relevant to defining "employer" in each of the state and federal statutes at issue, including the State HRL (*see e.g. Matter of New York State Div. of Human Rights v ABS Elecs., Inc.*, 102 AD3d 967, 969 [2d Dept 2013]; *Barbato v Bowden*, 63 AD3d 1580, 1581 [4th Dept 2009]; *Pepler v Coyne*, 33 AD3d 434, 435 [1st Dept 2006]; *Strauss v New York State Dept. of Educ.*, 26 AD3d 67, 72 [3d Dept 2005]; *Hafez v Avis Rent A Car Sys., Inc.*, 242 F3d 365 [2d Cir 2000]).

*Patrowich*, however, applied two different standards, one to the state laws and one to the federal statutes at issue:  "A corporate employee, though [the employee] has a title as an officer and is the manager or supervisor of a corporate division, [1] is not individually subject to suit with respect to discrimination based on age or sex under New York's Human Rights Law or its Labor Law" and "[2] is not individually subject to suit with respect to

discrimination based on age or sex . . . under the Federal Age Discrimination in Employment Act or Equal Pay Act if [the employee] is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others" (63 NY2d at 542 [citations omitted]).  The analysis that follows makes this distinction clear. In discussing the State HRL, the Court remarked that the definition for "employer" provided in the State HRL "relates only to the number of persons employed and provides no clue to whether individual employees of a corporate employer may be sued under its provisions" (*id.* at 543).  The Court noted, however, that other parts of the law specifically impose liability on "employee[s]" and "agent[s]," demonstrating that "the Legislature differentiated that provision from the general definition of 'employer'"; in other words, the statutory language recognized a difference between an "employer" and other "employees" and "agents" of that employer (*id.*).  Accordingly, we held in *Patrowich* that the State HRL does not render employees liable as individual employers.

We contrasted this narrow meaning of "employer" under the State HRL with the definitions of that same term found in the two federal statutes at issue, under which, according to the Court, "[t]he question [was] a closer one" (*id.*).  Those statutes broadly defined an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee" and as "a person engaged in an industry affecting commerce [and] any agent of such person" (*id.*).  Nevertheless, this expansive language required some limitation, and the Court concluded that "the weight of Federal authority is that 'economic reality' governs who may be sued under both [federal] statutes, and that a corporate employee . . . who . . . has not been shown to have any ownership interest or

power to do more than carry out personnel decisions made by others is not individually subject to suit under either statute" (*id.* at 543-544 [citing federal cases]). The "ownership" language was a way to limit which employees could qualify as employers under the expansive definitions in the federal statutes.

In *Patrowich*, it is clear that this Court distinguished between (1) the state statutes, under which a corporate employee simply does not qualify as an "employer," regardless of the employee's position or relationship to the employer, and (2) the federal statutes, under which, according to "Federal authority," individual employees may be subject to suit as "employers" if shown to have an ownership interest or power to do more than carry out personnel decisions made by others.[2]  Of course, *Patrowich* did not examine the meaning of "employers" pursuant to the City HRL, and we address it here only in light of the City Council's directive that "similarly worded provisions of federal and state civil rights laws [should be viewed] as a floor below which the City's Human Rights law cannot fall" (Local Law No. 85 [2005] of City of NY § 1).

---

[2] The "economic reality" test advanced by plaintiff, used to determine individual employer liability under the Fair Labor Standards Act (FLSA), has no application here (*see Irizarry v Catsimatidis*, 722 F3d 99, 109 [2d Cir 2013]).  In the FLSA, like the federal statutes at issue in *Patrowich*, Congress broadly defined "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee" (*id.* at 103).  The City Council did not include such expansive language in the City HRL definition of employer and, as discussed below, chose to differentiate between the liability of employers and those acting on an employer's behalf.  Likewise, the "control test" articulated in *Griffin v Sirva, Inc.* (29 NY3d 174 [2017])—discussed at oral argument but not raised in either party's submissions—is inapplicable.  In *Griffin*, the Court, responding to a certified question from the Second Circuit, provided guidance for determining whether a second corporation could be held liable as an employer under a provision of the State HRL addressing employment discrimination based on criminal history.

### III.

The language in the City HRL, like that found in the State HRL, is itself circumscribed and requires no external limiting principle exempting employees from individual suit as employers. Instead, where a plaintiff's employer is a business entity, the shareholders, agents, limited partners, and employees of that entity are not employers within the meaning of the City HRL. Rather, those individuals may incur liability only for their own discriminatory conduct, for aiding and abetting such conduct by others, or for retaliation against protected conduct (Administrative Code of City of NY § 8-107 [1], [6], [7]). This rule aligns with the structure of the City HRL and comports with the Court's interpretation of similar language in *Patrowich*. It is also consistent with the principles of vicarious and limited liability governing certain business structures (*see e.g.* Partnership Law §§ 26, 121-303; Limited Liability Company Law § 609; Business Corporation Law § 719).

The City HRL specifically imposes primary liability on employees and agents for some discriminatory acts (*see e.g. id.* § 8-107 [1] [a] [making it unlawful for "an employer or an employee or agent thereof" to discriminate based on gender]) but conspicuously does not impose vicarious liability on these individuals under section 8-107 (13) (b) (*see Patrowich*, 63 NY2d at 543 [use of "employee" and "agent" elsewhere in State HRL indicated that those individuals were not included in the term "employer"]). Furthermore, the vicarious liability provision itself applies when "the employee or agent exercised managerial or supervisory responsibility" (Administrative Code of City of NY § 8-107 [13] [b] [1]), differentiating between the liable party (employer) and the party committing the

offending conduct (employee or agent with managerial or supervisory responsibility). Similarly, the legislature chose to make an "owner, . . . manager, . . . agent or employee" of a place of public accommodation (*see id.* § 8-107 [4] [a]) and the "owner . . . of a housing accommodation" (*id.* § 8-107 [5] [a]) directly liable for discrimination, but again did not make those categories of individuals subject to vicarious liability as employers under section 8-107 (13) (b). These differences in the statutory provisions demonstrate that employees, agents, and others with an ownership stake are not employers within the meaning of the City HRL (*see Matter of Tonis v Board of Regents of Univ. of State of N.Y.*, 295 NY 286, 293 [1946]).

Indeed, employees and agents of a company are not ordinarily understood to be "employers," and are not normally subject to vicarious liability for the wrongs of corporate employees. Rather, an employee is "[s]omeone who works in the service of another person (the employer)" (Black's Law Dictionary [11th ed 2019], employee). "The principle that respondeat superior is a form of secondary liability that cannot be imposed upon the fellow employee of a wrongdoer is certainly well-defined and explicit in New York" (*Hardy v Walsh Manning Sec., L.L.C.*, 341 F3d 126, 130 [2d Cir 2003]). Similarly, although possessing more power to act on the corporation's behalf, an agent is "[s]omeone who is authorized to act for or in place of another" (Black's Law Dictionary [11th ed 2019], agent) and a "corporate agent" is an agent "authorized to act on behalf of a corporation; broadly, all employees and officers who have the power to bind the corporation" (Black's Law Dictionary [11th ed 2019], corporate agent). Though the common law imposes vicarious liability on the corporation for torts of its employees and agents committed within the scope

of their job duties (*see Riviello v Waldron*, 47 NY2d 297, 302 [1979]), "directors or officers are not subject to personal liability for the torts of corporation employees simply because the directors or officers hold corporate office" (19 CJS, Corporations § 635; *see Connell v Hayden*, 83 AD2d 30, 58 [2d Dept 1981]).

Shareholders are also not commonly understood to be employers, and to designate them as such for the purpose of imposing vicarious liability would go against the principles underlying the legal distinction. "The law permits the incorporation of a business for the very purpose of enabling its proprietors to escape personal liability" (*Walkovszky v Carlton*, 18 NY2d 414, 417 [1966]).

> "As a general rule, the law treats corporations as having an existence separate and distinct from that of their shareholders and consequently, will not impose liability upon shareholders for the acts of the corporation. Indeed, the avoidance of personal liability for obligations incurred by a business enterprise is one of the fundamental purposes of doing business in the corporate form" (*Billy v Consolidated Mach. Tool Corp.*, 51 NY2d 152, 163 [1980]).

Accordingly, at common law, shareholders are not subject to vicarious liability for the torts of a corporation's agents or employees (*Connell*, 83 AD2d at 58). The text of the City HRL demonstrates no intent to displace these settled legal principles.[3] Nor is there merit to the dissent's suggestion that the structure of the employer-business at issue here, a

---

[3] The dissent argues that the City HRL's use of the term "employer" "is not subordinate to principles of corporate or agency law" (dissenting op at 13), but given our holding we need not address any potential conflict between the State statutes delineating corporate or agency liability and employer liability imposed by the City HRL (*see Zakrzewska v New School*, 14 NY3d 469, 480-481 [2010]).

limited partnership, serves somehow to create "employer liability" for the partners (dissenting op at 13, 23-24). Whatever liability individual partners may have for unsatisfied judgments against the partnership, and the effect of the partnership structure on that liability has no bearing on whether the partner has individual "employer liability" under the City HRL. Furthermore, given the amorphous nature of its "interpretive approach" (dissenting op at 18 n.10), it is unclear what import a "limited" rather than a "limited liability" label on the entity would have on the dissent's assessment of an individual's liability.

Our conclusion does not run afoul of the City Council's instruction that "similarly worded provisions of federal and state civil rights laws [are] a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise" (Local Law No. 85 [2005] of City of NY § 1). The liability imposed on employers by the City HRL is substantially broader than that provided by its state counterpart, and as a result it is not necessary to distort the ordinary meaning of the term "employer" to accomplish the goal of the City Council's interpretive guidance. Moreover, the federal statutes plaintiff cites as supporting a broader definition are not "similarly worded" (*see Patrowich*, 63 NY2d at 543 [describing broader language of Equal Pay Act and Age Discrimination Act]; *supra n 3 [discussing broad language of FLSA]*). The unique provisions of the City HRL provide for broad vicarious liability for employers but that liability does not extend to individual owners, officers, employees, or agents of a business entity.

The dissent advocates for a contrary result based solely on *Albunio*'s rule of construction that the City HRL be interpreted "broadly in favor of discrimination plaintiffs,

to the extent that such a construction is reasonably possible" (dissenting op at 2, 8-9, 18, 29).  But any such broad construction must be *reasonable* and grounded in the language of the local law (*see e.g. Chauca v Abraham*, 30 NY3d 325, 332 [2017]).  Indeed, the dissent does not propose a workable rule—or indeed any rule—for reaching a contrary result in this case.  Although the dissent cites the opinion of the dissenting Justices (dissenting op at 11), it conspicuously fails to adopt the rule the dissent below applied.  And while the dissent here speaks of "owners" (dissenting op at 28-30), it does not address whether its suggested approach turns on ownership, or principles of control, or corporate titles, or some other formulation. Indeed, the dissent points to Bloomberg's role as a "co-founder, chief operating officer, president, and majority owner of the business" and of his "commanding role in the company" (dissenting op at 3, 13), but does not identify which of these roles render him an employer.  The litany of titles may well, in the dissent's view, make Bloomberg a "captain[] of industry" (dissenting op at 2), but provides no guidance for imposing individual liability.   Similarly, the dissent speaks favorably of *Griffin*'s application of New York common law to clarify the meaning of "employer" (dissenting op at 16-17), and agrees that case is "not directly on point" (dissenting op at 16), yet fails to identify what common law would supply a rule here.  Criticism alone, however forceful, provides no reasonable alternative.

IV.

Applying our rule to the present case, plaintiff has failed to allege that Bloomberg is her employer for purposes of liability under the City HRL.  Her allegations concerning his position at the company demonstrate only that he is an owner or officer of Bloomberg

L.P.    Additionally, plaintiff's allegations that Bloomberg fostered a culture of discrimination and sexual harassment at Bloomberg L.P., based primarily on news articles and reports of a deposition in an unrelated case, do not transform him into an employer for purposes of vicarious liability for Ferris's discriminatory conduct.    Any claims that Bloomberg engaged in offending conduct against plaintiff by discriminating, aiding and abetting discrimination, or retaliating are not advanced in this appeal.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

RIVERA, J. (dissenting):

The New York City Human Rights Law (NYCHRL) is "the most progressive in the nation and reaffirms New York's traditional leadership in civil rights" (Comm. on General Welfare, *Committee Report* [Aug. 17, 2005] at 2, quoting Mayor David Dinkins, available

at http://www.antibiaslaw.com/sites/default/files/all/CommitteeReport081705.pdf [last accessed Jan. 25, 2021]). To cement its status as a powerful deterrent to discrimination, the NYCHRL "shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof" and its text interpreted independently of other similarly worded federal and state legislation (Administrative Code of City of NY § 8-130 [a]). The New York City Council could not be clearer in this directive that our Court is prohibited from ascribing a narrow intention or construction to the purpose and statutory text of the NYCHRL. Accordingly, "we must construe . . . the City's Human Rights Law[] broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (*Albunio v City of New York*, 16 NY3d 472, 477-478 [2011]).

That rule of construction is dispositive in this appeal, in which we consider whether defendant Michael Bloomberg is an employer of those who work for Bloomberg L.P., the company that he built and that bears his name. The NYCHRL does not expressly limit "employer" to a business entity or exclude business owners from employer status. To the contrary, the statutory text and remedial scheme suggest the legislature's intent for a broad and flexible definition of "employer," in line with the public policy undergirding the NYCHRL. In that vein, the NYCHRL applies generally to businesses with as few as four employees and subjects employers to liability for their own discriminatory conduct and that of their supervisors (*see* Administrative Code §§ 8-102; 8-107 [1]). Maximizing the accountability of those at the top encourages preemptive action by captains of industry with the means to effectuate broad workplace change.

The question, then, is whether, affording the statute its broadest possible reading, as we must, this defendant is an "employer" based on his relationship to the business. Viewed in this light, plaintiff adequately alleges that defendant is an employer for purposes of the NYCHRL because he is co-founder, chief operating officer, president, and majority owner of the business.

The majority repeats the errors of the past, retreats from our mandate, and narrowly construes the NYCHRL to adopt a per se rule that favors corporate defendants. Applying its new rule, the majority concludes that this defendant is not an employer, notwithstanding his commanding role in the company. This interpretation of the statute is untenable, and so I dissent.

## I.

The New York City Human Rights Law was born of the City Council's recognition that "there is no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of groups prejudiced against one another and antagonistic to each other because of their actual or perceived differences" (Administrative Code § 8-101). The law, therefore, strikes directly at "prejudice, intolerance, bigotry, and discrimination, bias-related violence or harassment and disorder occasioned thereby," which "threaten the rights and proper privileges of [New York City's] inhabitants and menace the institutions and foundation of a free democratic state" (*id.*).

In furtherance of this public policy, the NYCHRL has been amended on several occasions to expand its coverage.[1] These amendments were intended to address retrenchment in federal civil rights law and our state courts' overly narrow interpretation of the NYCHRL (Comm. on General Welfare, *Committee Report* at 2 [quoting Mayor Dinkins, who explained that amendments to the NYCHRL were necessary because "there is no time in the modern civil rights era when vigorous local enforcement of anti-discrimination laws has been more important. Since 1980, the federal government has been steadily marching backward on civil rights issues"]; Report of the Committee on Civil Rights on Local Law 35 of 2016 at 8 ["Over at least the last 25 years, the Council has sought to protect the HRL from being narrowly construed by courts . . . . Some courts have recognized and followed this vision, but others have not . . . "]). As a committee of the City Council concluded, the amendments were in service of "a very specific vision: a Human Rights Law designed as a law enforcement tool with *no tolerance for discrimination in public life*" (Report of the Committee on Civil Rights on Local Law 35 of 2016 at 8 [emphasis added]).

---

[1] As I discuss, *infra*, in 1991, the New York City Council enacted comprehensive reforms to the NYCHRL in response to a perceived civil rights counter-revolution, which saw state and federal courts across the country adopt restrictive interpretations of anti-discrimination law (*see* Administrative Code tit 8 [1991]). Then in 2005, the Council passed the Local Civil Rights Restoration Act in response to decisions of this Court declining to afford the NYCHRL a broader interpretation than its state counterpart (*see* NYC Local Law No. 85 of 2005). And again in 2016, the Council sought to clarify its intent that the NYCHRL be construed liberally in favor of discrimination plaintiffs by identifying certain New York State court decisions that accurately reflected the properly broad construction of the statute (*see* NYC Local Law No. 35 of 2016).

In the past, our Court has, as it does today, parsimoniously interpreted state and city anti-discrimination laws. And, on several occasions, the City Council has repudiated such interpretations by adopting broader protections against unlawful discrimination. For instance, in *Matter of Totem Taxi v New York State Human Rights Appeal Bd.* (65 NY2d 300 [1985]), the Court considered a case brought under the New York State Human Rights Law (NYSHRL), in which a taxi driver hurled a racial slur at four Black women and threatened them with violence. The women filed complaints with the New York State Division of Human Rights against the taxi company. The charges against the company were sustained. The company appealed, arguing that it could not be held liable for the acts of its employees under a theory of respondeat superior.[2] This Court determined that liability ran only to the individual. Thus, the discriminatory conduct—which the Court described as "not only embarrassing and demeaning to [the women subjected to it] but to all civilized persons who hear of it," and "the kind of conduct which the Human Rights Law condemns and seeks to eliminate"—nonetheless did not give rise to vicarious liability on the part of the company (65 NY2d at 305-306).

This approach drew the ire of the New York City Council and high-ranking city officials. In explaining the 1991 amendments to the NYCHRL, then-Mayor David Dinkins specifically mentioned the Court's holding in *Totem Taxi* as a motivation for expanding the anti-discrimination protections available under the City's law:

---

[2] "Under the doctrine of Respondeat superior, an employer will be liable for the negligence of an employee committed while the employee is acting in the scope of [the employee's] employment" (*Lundberg v State of New York*, 25 NY2d 467, 470 [1969]).

> "Even on the state level, narrow interpretations of civil rights laws have retarded progress. For example, the State Court of Appeals has made it virtually impossible to hold taxi companies responsible for the discriminatory acts committed by their drivers. There is, therefore, no incentive for these companies to curb bias on the part of their drivers, and persons of color still routinely face difficulty in getting a cab to take us where we want to go" (Mayor David N. Dinkins, *Remarks by Mayor David N. Dinkins at Public Hearing on Local Laws* [Jun. 18, 1991], available at http://www.antibiaslaw.com/sites/default/files/all/LL39LegHist-Mayor.pdf [last accessed Jan. 15, 2021]).[3]

Despite the intent of the City Council, this Court continued to ignore textual and historical support for independent consideration of the NYCHRL and applied "rote parallelism" which merely tracked contemporary analysis under the NYSHRL and Title VII, the federal employment anti-discrimination analog. Frustrated with this interpretive approach, the City Council enacted the Local Civil Rights Restoration Act (LCRRA) in 2005. The LCRRA was intended "to clarify the scope" of the NYCHRL because

> "[i]t is the sense of the Council that New York City's Human Rights Law has been construed too narrowly to ensure protection of the civil rights of all persons covered by the law. In particular, through passage of this local law, the Council seeks to underscore that the provisions of New York City's Human Rights Law are to be construed independently from similar or identical provisions of New York state or federal statutes" (NYC Local Law No. 85 of 2005).

---

[3] *See also e.g.* William Neuman, *New York Office to Address Discrimination by Taxis and For-Hire Vehicles*, NY Times, Jul. 31, 2018, available at https://www.nytimes.com/2018/07/31/nyregion/uber-taxis-minorities-bias-refusal-nyc.html (last accessed Jan. 25, 2021); Gabrielle Gurley, *Racism Merges into New York's Ride-Hailing Debate*, The American Prospect, Aug. 7, 2018, available at https://prospect.org/civil-rights/racism-merges-new-york-s-ride-hailing-debate/ (last accessed Jan. 25, 2021).

Critically, the Council explained that,

> Interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of the New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws *as a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise*" (*id.* [emphasis added]).

To further emphasize the Council's intent that courts employ an independent and robust analysis of the NYCHRL, the LCRRA amended the section titled "Construction" to declare that "[t]he provisions of this title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have so been construed" (Administrative Code § 8-130 [a]).[4]

When the law was amended in 2005, this Court was again singled out for its failure to give the NYCHRL the liberal, far-reaching application intended by the Council. The Committee on General Welfare's report on the proposed legislation, for example, specifically cited *McGrath v Toys "R" Us, Inc.* (3 NY3d 421 [2004]) as one of several "recent judicial decisions [which] underscore the need to clarify the breadth of protections afforded by New York City's human rights law" (Comm. on General Welfare, *Committee Report* [Aug. 17, 2005] at 4, available at

---

[4] Prior to the 2005 amendments, section 8-130 provided that "[t]he provisions of this chapter shall be construed liberally for the accomplishment of the purposes thereof."

http://www.antibiaslaw.com/sites/default/files/all/CommitteeReport081705.pdf        [last

accessed Jan. 25, 2021]).

In *McGrath*, the Court determined that broad statements regarding the intended

liberal construction of the NYCHRL were insufficient to justify interpreting the law more

broadly than its state counterpart—a holding the City Council explicitly rejected in

enacting the 2005 amendments (*see* Annabel Palma, *Statement at the Meeting of the New

York City Council 41-42* [Sept. 15, 2005] ["Insisting that our local law be interpreted

broadly and independently will safeguard New Yorkers at a time when . . . state civil rights

protections are in jeopardy. There are many illustrations of cases, like . . . *McGrath* and

*Forrest v Jewish Guild for the Blind*, 3 NY3d 295 [2004]) that have either failed to interpret

the City Human Rights Law to fulfill its uniquely broad purposes, ignore the text of specific

provisions of the law, or both"]).[5]

Following the 2005 amendments, it appeared that the Court understood this clear

expression of legislative intent. In *Albunio*, the Court unanimously declared that, in

accordance with the LCRRA, we "must construe . . . the City's Human Rights Law[]

broadly in favor of discrimination plaintiffs, to the extent that such a construction is

---

[5] In *Forrest*, the plaintiff alleged that her supervisor had discriminated against her on account of race and that she was subjected to a hostile work environment. Our Court asserted that the NYCHRL's provisions "mirror" the NYSHRL's and should be "analyzed according to the same standards" (3 NY3d at 390 n 3). Additionally, the Court held that, even if the quantum of alleged harassment the plaintiff experienced were sufficient to be actionable, the defendant employer would still not be liable for its supervisor's harassment under either the NYSHRL or the NYCHRL because an "employer cannot be held liable [under state law] for an employee's discriminatory act unless the employer became a party to it" (*id.* at 311 [internal citation and quotation marks omitted]).

reasonably possible" (*Albunio*, 16 NY3d at 477-478; *see also Williams v New York City Hous. Auth.*, 61 AD3d 62, 68-69 [1st Dept 2009] ["(T)he text and legislative history represent a desire that the City HRL meld the broadest vision of social justice with the strongest law enforcement deterrent"] [internal citation and quotation marks omitted]). Finally, and in no uncertain terms, the Court recognized that the legislative intent of the NYCHRL obligates the judiciary to interpret the law in favor of plaintiffs in discrimination suits, to the furthest extent reasonably possible. With this background in mind, I now turn to the interpretive issue presented on this appeal.

## II.

Plaintiff, under the pseudonym Margaret Doe, [6] filed the underlying complaint alleging violations of the NYCHRL for gender discrimination at her workplace, Bloomberg L.P., a limited partnership. She averred that she was 22 and had just graduated college when she commenced her first professional job at Bloomberg L.P. Shortly after starting and continuing for the next three years she worked in a hostile work environment where her supervisor, Nicholas Ferris, relentlessly sexually harassed her and on two occasions raped her. She further averred that, due to the toxic work environment and the harm she suffered as an employee, she was forced to take indefinite medical leave.

---

[6] Plaintiff filed her action pseudonymously, explaining the need for anonymity given the severe nature of her injuries, the emotional distress she suffered, her current fragile emotional and physical state, her ongoing need for psychotherapy and other medical treatment, and the risk of retaliatory physical or mental harm.

Plaintiff named as defendants Bloomberg L.P., Ferris, and Michael Bloomberg, the majority owner[7] of Bloomberg L.P. As alleged in the complaint, Bloomberg was at all relevant times the co-founder, chief executive officer, and president of Bloomberg L.P. He served as CEO until his election as mayor of New York City and resumed that position after his term as mayor ended and while plaintiff was employed with the company. Plaintiff alleges that, while mayor, Bloomberg maintained communication with those who had replaced him as CEO, including on matters related to Bloomberg L.P.'s handling of sexual harassment and discrimination claims by employees, of which there were many.

Plaintiff further alleges that the corporate culture at Bloomberg L.P. was deeply misogynist, and female employees were regularly sexually objectified and subjected to comments regarding their physical appearance. Plaintiff maintains that this sexist and sexually charged behavior was known and encouraged by Bloomberg himself, and that he was a defendant in another lawsuit charging him and several managers with sexist behavior. She alleges that Bloomberg L.P.'s human resources department was notoriously indifferent towards the sexual harassment complaints of lower-level female employees and lax in its enforcement of policies meant to prevent sex discrimination and harassment. Plaintiff further maintains this was indicative of a "top-down culture that is blatantly hostile

---

[7] Defendant, at various points in his briefing, concedes ownership in Bloomberg L.P., and does not controvert the Appellate Division's assumption that he holds an ownership interest in the company. Nor does he deny plaintiff's assertion in opposition to his motion to dismiss that he is a majority owner. Therefore, given the pre-answer posture of this appeal, and the parties' representations throughout this litigation, I assume as fact for purposes of this appeal that defendant is the majority owner of Bloomberg L.P.

towards women" and that, following Bloomberg's lead, sexual harassment is rampant, leaving female employees vulnerable to abuse.

Bloomberg moved to dismiss the complaint against him in its entirety for failure to state a cause of action, arguing that he was not an "employer" within the meaning of the NYCHRL. Upon reargument the court held that plaintiff sufficiently stated claims against Bloomberg as an employer.

On appeal, a divided Appellate Division reversed, holding that plaintiff had failed to allege that Bloomberg qualified as her employer under the NYCHRL because she failed to allege that he encouraged, condoned, or approved the specific conduct which gave rise to the claim (*Doe v Bloomberg*, 178 AD3d 44, 50-51 [1st Dept 2019]). The majority explained that the NYCHRL could not be read to impose strict liability on any individual holding an ownership stake or leadership position in a company, because doing so would increase the number of individuals who could be held strictly liable and would hold vicariously liable any individual owner or high-ranking executive of any corporation in New York City, in contravention of the principles underlying New York corporate law. The dissenting justices argued that the majority disregarded the plain wording of the NYCHRL detailing when an employer is strictly liable for the discriminatory conduct of its employees and agents and the general judicial principle that anti-discrimination laws should be liberally construed.

III.

On a motion to dismiss pursuant to CPLR 3211 (a) (7), the Court must "accept the facts as alleged in the complaint as true, accord plaintiff[ ] the benefit of every possible

favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (*Leon v Martinez*, 84 NY2d 83, 87-88 [1994]). "Accepting the allegations as true, [the Court's] sole criterion is whether the pleading states a cause of action, and if from its four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law a motion for dismissal will fail" (*Polonetsky v Better Homes Depot*, 97 NY2d 46, 54 [2001] [internal quotation marks and citation omitted]).

Assuming the facts alleged about Bloomberg's role vis-à-vis Bloomberg L.P., the next step is to consider whether he is an "employer" for purposes of the NYCHRL. I agree with the majority that the Appellate Division's reasoning is erroneous. Indeed, as one of the principal drafters of the amendments to the NYCHRL has explained, "Section 8-107 (13) (b) (1) imposes no requirement that the employer encourage, condone, or acquiesce in the conduct," because the Council sought to impose strict liability on employers (Craig Gurian, *A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law*, 33 Fordham Urb L J 255, 270-271; 270 n 66 [2006]). Rather, whether a party is an "employer" for purposes of the NYCHRL turns on their relationship to the plaintiff and the workplace. In other words, the starting point is not whether a party will be strictly liable for the actions of another; the measure of liability is the end point, to be considered after the party is established to be an employer. That is where our agreement ends because the majority essentially replicates this flaw in its analysis and adopts an overly narrow rule that undermines the purpose of the NYCHRL. The majority concludes that because plaintiff worked for a business entity, vicarious liability can only be imposed

on Bloomberg L.P., not Bloomberg the individual. But the NYCHRL does not limit "employer" to any single party, and the NYCHRL's use of that term is not subordinate to principles of corporate or agency law. The purpose, public policy, and text of the NYCHRL do not tolerate the majority's interpretation of "employer," which allows owners to avoid vicarious liability, not by compliance with the NYCHRL but by adoption of a business model intended for a different purpose—to maximize profit and limit investor debt liability.

The majority incorrectly assumes that principles of *corporate* liability resolve the questions presented on this appeal. The business here, however, is a limited partnership, which, under New York law, passes some personal risks onto the business's partners, and defendant allegedly occupies a commanding role in the company (*see e.g. Ederer v Gursky*, 9 NY3d 514, 522 [2007] ["Just as a principal is liable for the acts of its agents, each partner is personally responsible for the acts of other partners in the ordinary course of the partnership's business"]). The majority insists that the difference between a corporation and a limited partnership is irrelevant and that, in any event, partners in limited partnerships would not face liability on the facts presented on this appeal. This is incorrect; even limited partners will become liable as general partners when they "take[] part in the control of the business" (NY Partnership Law § 96 [McKinney]). In contrast, shareholders' liability does not increase as they accumulate more shares in the corporation.[8]

---

[8] While the majority asserts that the structure of the business entity has no bearing on its liability here (majority op at 12-13), that contention has no basis in the laws of this state. For instance, even a brief review of Partnership Law § 26 demonstrates the overbreadth of the majority's rule. Section 26 (c) (i) provides that "each partner, employee or agent of" a limited liability partnership (LLP) "shall be personally and fully liable and accountable for any negligent or wrongful act or misconduct committed by . . . any person under [their]

The parties dispute the definition of "employer" as it relates to section 8-107 (13) (b), which outlines when an employer may be held liable for the unlawful discriminatory act of an employee or agent. The provision states,

> "An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent . . . only where: (1) The employee or agent exercised managerial or supervisory responsibility; or (2) The employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or (3) The employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct" (Administrative Code § 8-107 [13] [b]).

---

direct supervision and control while rendering professional services on behalf of" the LLP (*see also* Partnership Law § 26 [c] [ii] [extending the same liability to "each shareholder, director, officer, member, manager, partner, employee and agent of" a business entity that is a partner in a LLP]). In other words, the Partnership Law affirmatively contemplates vicarious liability for partners of LLPs (and, in the case of corporate partners of LLPs, for their officers and shareholders) for the wrongful acts of supervisees under their control. (The majority mischaracterizes this liability as applying only to "unsatisfied judgments" [majority op at 13].) This statutorily authorized vicarious liability is markedly different from the liability faced by a corporation's shareholders and officers and, therefore, demonstrates the inaccuracy of the majority's claim that, irrespective of the "the structure of the employer-business at issue," the same principles of liability apply (*id.* at 12). Second, this statutory liability undermines the majority's contention that extending "broad vicarious liability for employers [under the NYCHRL] . . . to individual owners, officers, employees, or agents of a business entity" (*id.* at 13) would mark a radical departure from "settled legal principles" of the liability of business entities (*id.* at 12).

Both parties agree that Section 8-107 (13) (b), while indicating *when* an employer is liable

for the unlawful discriminatory acts of an employee or agent, does not, on its own, define

*who* is an employer in the first instance.[9]

Section 8-102, titled "Definitions," states that,

> "the term 'employer' does not include any employer that has fewer than four persons in the employ of such employer at all times during the period beginning twelve months before the start of an unlawful discriminatory practice and continuing through the end of such unlawful discriminatory practice, provided however, that in an action for unlawful discriminatory practice based on a claim of gender-based harassment pursuant to subdivision one of section 8-107, the term 'employer' shall include any employer, including those with fewer than four persons in their employ. For purposes of this definition, (i) natural persons working as independent contractors in furtherance of an employer's business enterprise shall be counted as persons in the employ of such employer and (ii) the employer's parent, spouse, domestic partner or child if employed by the employer are included as in the employ of such employer" (Administrative Code § 8-102).

The NYCHRL contains no further explication of what constitutes an employer, except by

differentiation and implication. The NYCHRL distinguishes employer from various

subordinate actors, namely "employee," "agent," an employee or agent who exercises

"managerial or supervisory responsibility," "independent contractor," and "intern" (*id.*).

---

[9] Section 8-107 (13) (d) allows an employer to present mitigation evidence when facing liability based on the conduct of its employees, agents, or independent contractors. The employer may show, for example, that it established policies and procedures for preventing and detecting unlawful discrimination, such as robust reporting processes and mechanisms for dealing with employees found to have discriminated; additionally, an employer may show that it has a record of no, or relatively few, prior incidents of discrimination (*see* Administrative Code § 8-107 [13] [d]).

Also distinguished are a "labor organization"—which deals with employers—and an "employment agency"—responsible for procuring employees or work opportunities (*id.*).

Bloomberg does not fall within any of these defined categories of actors. He is not a subordinate; he was at all relevant times and remains the majority owner, president, CEO, and co-founder of the business that bears his name. Further, plaintiff alleges that, from his high-level position, he fostered the sexist culture that created the sexually hostile workplace she joined, thereby connecting him to the alleged conduct of defendant Ferris. It takes no great leap of logic to conclude that the owner of a business is the employer of those who work for the business. This is why, for instance, the Appellate Division rightly noted that a sole proprietor is an employer for purposes of the NYCHRL (*Bloomberg*, 178 AD3d at 47-48). Nothing in the NYCHRL limits the definition of employer, as applied to an individual, to a sole proprietor. And it is logical to treat an individual with control over the business as an employer in fact, if not in name—particularly given the liability faced by low-level supervisors and managers for their discriminatory conduct. It is, of course, eminently reasonable to hold individuals personally liable for their own discriminatory acts. But it beggars belief that this company's owner—alleged to have fostered a pernicious culture of misogyny that facilitated the egregious conduct to which plaintiff was subjected—should nonetheless escape liability by virtue of his position at the top of the company hierarchy.

Indeed, this commonsensical conclusion is clear from our recent decision in *Griffin v Sirva, Inc.* (29 NY3d 174 [2017]). While I agree with the majority that *Griffin* is not directly on point (majority op at 9 n 2), that case nonetheless elucidates an important

principle for our construction of anti-discrimination statutes. In *Griffin* we recognized that the NYSHRL, like its city counterpart, provides no clear definition of "employer" (29 NY3d at 185, citing *Patrowich*, 63 NY2d at 543). To clarify the term's meaning, we held that "we need look no further than our own lower courts to determine who is an employer under the Human Rights Law" (*Griffin*, 29 NY3d at 186), recognizing that those lower courts frequently "applied New York common law to make that determination" (*id.*). *Griffin*, then, establishes that state common law cannot be disregarded in determining who counts as an employer under New York anti-discrimination statutes. This is, in fact, the approach prescribed by the United States Supreme Court, which has held that, in the absence of statutory definitions in anti-discrimination legislation, courts should look to the common law to supply those definitions (*see Nationwide Mut. Ins. Co. v Darden*, 503 US 318, 322-323 [1992]; *cf. id.* at 323-324 ["In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished"] [internal citation and quotation marks omitted]; *see also Gulino v New York State Educ. Dept.*, 460 F3d 361, 371-372 [2d Cir 2006] [holding that, because Title VII contains a "nominal" or "unhelpful" definition of "employer," "the common-law element of control is the principal guidepost that should be followed"] [internal citation and quotation marks omitted]). Applying "common-law principles . . . [to] determine who may be liable as an employer," requires us to place the "greatest emphasis . . . on the alleged employer's power 'to order and control' the employee in [the employee's] performance of work" (*id.*); here, plaintiff alleges that defendant had a significant degree of power to order and control the work

performance of Bloomberg L.P.'s employees. Indeed, she alleges that, while mayor, he maintained communication with the CEO at that time regarding Bloomberg L.P.'s handling of employee sexual harassment and discrimination claims. Thus, under the relevant common law principles (reaffirmed in our recent decision in *Griffin*), defendant would qualify as an employer. That the majority cites corporate and agency law purportedly disfavoring finding defendant to be an employer (majority op at 11-12) ultimately matters very little, given that the City Council has expressed its clear intent that, as between multiple, competing, reasonable interpretations, "we must construe . . . the [NYCHRL] broadly in favor of discrimination plaintiffs" (*Albunio*, 16 NY3d at 477-478).

The Court's prior decision in *Patrowich v Chemical Bank* (63 NY2d 541 [1984]) is also instructive. In *Patrowich* we held that,

> "[a] corporate employee, though [such employee] has a title as an officer and is the manager or supervisor of a corporate division, is not individually subject to suit with respect to discrimination based on age or sex under New York's Human Rights Law or its Labor Law or under the Federal Age Discrimination in Employment Act or Equal Pay Act if [the employee] is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others" (*id.* at 542 [citations omitted]).

In other words, a corporate employee—including CEOs like defendant—will not be held liable as an employer under the NYSHRL unless "shown to have . . . [an] ownership interest or . . . power to do more than carry out personnel decisions made by others" (*id.*).[10]

---

[10] The majority attempts to distract from its flawed analysis by claiming I merely criticize but fail to provide a rule by which to discern an employer for purposes of the NYCHRL (majority op at 14). I do not concoct a novel "rule" but rather apply the interpretive approach established by common law and precedent. As I clearly state, plaintiff has

The majority asserts that this plain language is, actually, quite muddled. Apparently, what the Court meant to say is that a corporate employee is not individually subject to suit under the NYSHRL or the State Labor Law—full stop. Separately, a corporate employee is not subject to suit under the Federal Age Discrimination in Employment Act or Equal Pay Act unless it is established that they have an ownership interest or the power to do more than carry out personnel decisions made by others. While the actual text of the opinion contains no punctuation or clarifying language that might indicate that the *Patrowich* Court was drawing such a distinction between the state and federal statutes, this distinction, according to the majority, is evident from the Court's ensuing analysis. Not so. The *Patrowich* Court acknowledged that the NYSHRL "provides no clue to whether individual employees of a corporate employer may be sued under its provisions" (*id.* at 543). The Court also noted that one subdivision of that law distinguished between a certain class of employers and "employee[s] and agent[s] thereof" (*id.*). The majority claims that this portion of the opinion "demonstrat[es] that . . . the State HRL does not render employees liable as individual employers" (majority op at 8). That is a strained and unsupportable reading of the case. In the words of the *Patrowich* Court, that subdivision of the NYSHRL merely "suggested" that individual employees of a corporate employer are not liable (63 NY2d at 543). But even assuming the majority were correct, it would not

---

sufficiently pleaded facts supporting defendant's ownership interest in the company and his control over the workplace, thereby supporting her claim that he should be treated as an employer. The majority must understand my points of law, given how hard it attempts to counter them.

matter. *Patrowich* considered liability under the NYSHRL while the issue here turns on the meaning of "employer" under the NYCHRL.

Notably, *Patrowich* was the law when the Council amended the NYCHRL in 1991 and 2005. By that time, lower courts had understood the case to stand for the same proposition that I do—that a party will be held vicariously liable when "shown to have . . . [an] ownership interest or . . . [the] power to do more than carry out personnel decisions made by others" (*id.* at 542). We must assume the Council was aware of the state of the law when it amended the NYCHRL (*see People ex rel. Postal Tel.-Cable Co. v State Bd. of Tax Commrs.*, 224 NY 167, 183 [1918]; *see also People ex rel. Sibley v Sheppard*, 54 NY2d 320, 325 [1981]; *Easley v New York State Thruway Auth.*, 1 NY2d 374, 379 [1956] ["Legislatures are presumed to know what statutes are on the books"]). Yet, the Council never sought to limit strict liability to the business entity rather than its owners or high-level executives. To the contrary, with each amendment it expanded liability. Indeed, it added employer vicarious liability as part of the 1991 amendments. That is a long time to allow an erroneous interpretation to go uncorrected, especially if, as the majority claims, the interpretation violates tenets of corporate and agency law meant to protect those same actors from liability.

Particularly telling is the fact that the New York State Division of Human Rights brought a number of anti-discrimination enforcement actions against owners and high-ranking employees, which various Appellate Divisions affirmed by citation to *Patrowich* (*see e.g. Matter of State Div. of Human Rights v Steve's Pier One, Inc.*, 123 AD3d 728,

729 [2d Dept 2014] [holding that "(s)ubstantial evidence also supports the determination (of the Commissioner of the New York State Division of Human Rights) that . . . the owner and general manager of the restaurant where the complainant was employed at the time, is individually liable for the discrimination" and citing *Patrowich*]; *Matter of New York State Div. of Human Rights v ABS Elecs., Inc.*, 102 AD3d 967, 969 [2d Dept 2013] [finding that the "Commissioner . . . properly imposed liability on" an individual manager because "there is substantial evidence in the record that . . . (the manager) had the authority 'to do more than carry out personnel decisions made by others'" and citing *Patrowich*]; *Matter of State Div. of Human Rights v Koch*, 60 AD3d 777, 777-778 [2d Dept 2009] [holding that "(s)ubstantial evidence . . . supports the (Commisioner's) determination that (an individual), as owner and president . . . , was individually liable for the discrimination" and citing *Patrowich*]; *Matter of West Taghkanic Diner II, Inc. v New York State Div. of Human Rights*, 105 Ad3d 1106, 1109 [3d Dept 2013] [determining that discrimination plaintiff was entitled to enforcement awards against corporation *and* owner of corporation and citing *Patrowich*]; *Matter of New York State Div. of Human Rights v Nancy Potenza Design & Bldg. Servs.*, Inc., 87 AD3d 1365, 1366 [4th Dept 2011] [determining that "respondent . . . , as the owner and president of the employer who condoned sexual harassment, may be held individually liable for the discriminatory actions that damaged the complainant" and citing *Patrowich*]). While it is true that the individuals determined to be employers in these cases *also* took part in the discriminatory conduct, that is also wholly irrelevant. Unlike the NYCHRL, there is no vicarious liability provision under the NYSHRL (*see Forrest*, 3 NY3d at 311 ["(A)n employer cannot be held liable (under state law) for an employee's

discriminatory act unless the employer became a party to it . . ."] [internal citation and quotation marks omitted]).[11] Thus, the threshold inquiry before liability attaches under the NYSHRL is whether an individual is an employer. In answering that inquiry, the Appellate Division in each of these cases cited *Patrowich*. The majority has put forward no explanation for why so many courts would regularly invoke *Patrowich* if not for its definition of "employer" under the NYSHRL.

The majority may be correct in its implicit assumption that the state agency charged with enforcing the NYSHRL—as well as the courts which upheld that agency's determinations—were simply mistaken as to what *Patrowich* actually said. However, at a minimum, these decisions show that, for purposes of the NYSHRL, a definition of employer that reaches owners and high-ranking employees is a reasonable one. All the more so, then, would such an interpretation be reasonable under the *NYCHRL*, whose drafters made perfectly clear that the statute was to be interpreted more broadly than its state counterpart. Put another way, in accordance with the Council's directive, the NYSHRL is

---

[11] The statute also extends liability to individual non-employers who "aid, abet, incite, compel or coerce" discriminatory conduct (*see* Executive Law § 296 [6]). However, in *Steve's Pier One*, *ABS Electrics*, *Koch*, and *West Taghkanic Diner* there do not appear to be any allegations of aiding and abetting. In *Nancy Potenza Design*, the individual owner determined to be an employer under the NYSHRL was alleged to have condoned the discriminatory conduct, rather than having aided and abetted it. Thus, in each of these cases, the courts were required to decide whether the individual owners and managers were, in the first instance, "employers." In determining that they were, the courts all relied on *Patrowich*.

> *"a floor below which the City's Human Rights law cannot fall,*
> *rather than a ceiling above which the local law cannot rise"*
> (NYC Local Law No. 85 of 2005 § 1 [emphasis added]).[12]

The majority also suggests that the structure of the NYCHRL precludes finding high-ranking corporate employees and owners vicariously liable (majority op 10-11). But the subdivisions the majority invokes do no such thing. For instance, the fact that the "City HRL specifically imposes *primary* liability on employees and agents for some discriminatory acts" is irrelevant (*id.* at 10 [emphasis added]). The fact that individuals who directly participate in unlawful discrimination may face personal liability says precisely nothing about any vicarious liability they may *also* face. Thus, the majority's conclusion that the NYCHRL "conspicuously does not impose vicarious liability on these individuals under section 8-107 (13) (b)" is no more than question-begging (*id.*). Similarly, that section 8-107 (13) (b) mentions both the vicariously liable employer *and* the individual employee responsible for the unlawful discrimination cannot possibly illuminate the meaning of the term "employer" for purposes of that subdivision.

Lastly, the majority concludes that broad principles of corporate and agency law demonstrate that individual corporate employees and shareholders face no vicarious liability under the NYCHRL. As an initial matter, as I have discussed, Bloomberg L.P. is

---

[12] As of February 8, 2020, the NYSHRL defines "employer" to "include all employers within the state" (NY Exec Law § 292 [5]). Previously, the NYSHRL applied only to employers with four or more employees. This amendment demonstrates that, contrary to the majority's holding today, anti-discrimination protections in New York are trending towards *expanding* employer liability for discriminatory conduct.

a limited partnership, and the principles relied upon by the dissent are inapplicable. In any event, the majority's conclusion fails to account for the specific allegations that plaintiff has made with respect to defendant. Far from alleging that defendant was a "fellow employee" (majority op at 11, citing *Hardy v Walsh Manning Sec., L.L.C.*, 341 F3d 126, 130 [2d Cir 2003]), plaintiff's factual allegations—which must be deemed true for purposes of assessing the motion to dismiss—identify defendant as co-founder, president, and CEO, who, during his tenure as mayor, played an outsize role in shaping the company's handling of sexual harassment of the kind plaintiff was subjected to. Plaintiff alleged that Bloomberg's control over the business promoted a culture of sexism and harassment, fostering the unlawful discrimination she suffered. And while the majority concludes that the "text of the City HRL demonstrates no intent to displace these settled legal principles" (majority op at 12), that conclusion can hardly be reconciled with either the legislative intent undergirding the NYCHRL or its unambiguous declaration of that intent.

The structure and legislative history of the NYCHRL make plain its purpose to impose liability broadly. The Council determined that accountability should not be limited to individual bad actors but also to those with controlling authority over those actors. This approach furthers the purpose of rooting out discrimination in all its forms by imposing liability on those who can most effectively bring about change. So, while a person is liable for their own discriminatory conduct (Administrative Code § 8-107 [1] [a]), owners and those with high-level executive status are vicariously liable as employers because they have the power to change the culture and ferret out discrimination in their business (*see* Gurian, *A Return to Eyes on the Prize*, 33 Fordham Urb L J at 270 n 66 [drafter of the 2005

amendments explaining that the New York City "Council designed the vicarious liability section to, inter alia, hold employers to a high level of liability for employment discrimination"] [internal citation and quotation marks omitted]).

Although the state legislature has expressly permitted vicarious liability in circumstances not dissimilar from the those present in this appeal (*see* n 8 *supra*), the majority nonetheless insists that reading the NYCHRL to permit such vicarious liability would not be "reasonable" (majority op at 13-14). This misguided approach—predicated on the misapplication of corporate liability to a limited partnership—makes the majority's willingness to jettison the requirement of liberal construction in favor of discrimination plaintiffs all the more unsupportable. In any event, even if these "longstanding principles of corporate liability" applied here, it is plainly the intent of the New York City Council to displace those principles to achieve a society in which there is "no tolerance for discrimination in public life" (Report of the Committee on Civil Rights on Local Law 35 of 2016 at 8). Despite this and other unambiguous statements of legislative intent, the majority makes the startling claim that, "given [its] holding [it] need not address any potential conflict between the State statutes delineating corporate or agency liability and employer liability imposed by the City HRL" (majority op 12 n 3)—notwithstanding the fact that its holding only serves to exacerbate that conflict.

IV.

If owners and high-ranking employees wish to avoid strict liability, they simply need to bring their business into compliance with the NYCHRL and purge discrimination from their workplace. The Council sought to encourage such conduct both by imposing vicarious liability on employers and providing the opportunity for mitigation of liability with proof of diligent efforts to achieve a discrimination-free workplace (*id.* § 8-107 [13] [d]). For example, an employer may avoid vicarious liability by proving that it established a "meaningful and responsive procedure for investigating complaints" of discrimination by employees or by demonstrating a "record of no, or relatively few, prior incidents of discriminatory conduct" by employees (*id.*). The Council was within its authority to choose both the carrot and the stick to further its progressive, robust anti-discrimination agenda.

Leadership starts at the top. Legal scholarship on workplace sexual harassment has long identified the "top-down" nature of discriminatory workplace cultures. Scholars have noted that CEOs play a powerful role in shaping workplace cultures, either hampering or fostering discriminatory behavior, even when they have not personally discriminated against an individual plaintiff:

> "For men to behave more responsibly toward their female colleagues, they must work in a corporate culture that supports and affirms gender equity . . . . The chief executive officer (CEO) establishes that culture. Male employees and managers will adapt to the corporate culture in order to survive and succeed within that culture. It seems, therefore, that for companies to change, the men who work for them must change. The best way to inspire change among male executives, managers, and employees is to inspire change

among America's CEOs" (*see* Cheryl L. Wade, *Transforming Discriminatory Corporate Cultures: This Is Not Just Women's Work*, 65 Md L Rev 346, 347 [2006]).

In other words, ensuring that powerful individuals at the top of powerful companies face liability when their managers repeatedly harass and assault vulnerable employees provides the employer with exactly the sort of incentive to "curb bias" that Mayor Dinkins hoped the 1991 amendments to the NYCHRL would accomplish.

The recent emergence of the #MeToo movement laid bare the extent to which sexual harassment is common within business entities, where powerful company executives both tolerate and foster sexism in their ranks. For decades, businesses "would avoid liability by proliferating policies and offering trainings in cultures in which sexual harassment festered" (Amelia Miazad, *Sex, Power, and Corporate Governance*, 54 UC Davis L Rev [forthcoming 2021]). However, "#MeToo . . . exposed just how anemic sexual harassment training programs are" (*id.*). Male-dominated business cultures facilitate sexual harassment, and, recently, such cultures have become sources of concern for stakeholders (*see e.g.* Verified Derivative Compl. at 1–2, *City of Monroe Emps.' Ret. Sys. v Murdoch*, No. 2017-0833 [Del. Ch. filed Nov. 20, 2017]; *In re Signet Jewelers Ltd. Sec. Litig.*, No. 1:16-cv-06728-JMF [SDNY filed Mar. 22, 2018], at 61). As the legal scholarship suggests, these derivative actions have shifted the focus from mere compliance with sexual harassment training programs to accountability for high-ranking executives (*see* Miazad, *Sex, Power, and Corporate Governance*, 54 UC Davis L Rev). The majority bucks this welcomed trend, ignores clear legislative direction, and embraces an exceedingly narrow approach to the NYCHRL which would hold liable only those lower-ranking employees

who commit discriminatory acts, while leaving higher-ups (who may be the chief architects of these discriminatory workplace cultures) exempt from the NYCHR's vicarious liability provisions.

Assume the following hypothetical: A person who is the founder and sole owner of a business adopts a policy that no female shall be promoted to a managerial position. The owner then transforms the business into a limited partnership, and holds positions of majority owner, president, and CEO. The person subsequently leaves for another opportunity but retains status as an owner and appoints a successor as CEO. The policy of no female managers remains unchanged. A few years later, the person returns to the business and retakes the reins as CEO. The policy continues throughout this entire period, even as internal complaints increase and litigation ensues, challenging the policy. Under the majority's rule, a victim of the discriminatory policy cannot sue the architect of that policy for the actions of the managers and supervisors who effectuated that policy. That is the case even if the person holds a 99% ownership interest in the business. According to the majority, if this person structured the business in such a way as to shield themselves from individual liability for the company's debts, then they must also be shielded from liability for expressly promoting discrimination as well, regardless of their control of the workplace.[13] That undermines the NYCHRL, which holds employers vicariously liable for the actions of supervisors.

---

[13] Supreme Court dismissed plaintiff's aiding and abetting claim pursuant to NYC Administrative Code § 8-107 (6). As plaintiff's counsel explained in oral argument, lower courts have interpreted the NYCHRL's aiding and abetting provision to be limited to the specific discriminatory conduct charged. Plaintiff did not appeal this portion of the decision

In contrast, the interpretation I adopt ensures accountability from the top down. Owners cannot escape the consequences of the policies that they impose or the cultures that they foster within their businesses. Owners would thus diligently ensure full compliance with the NYCHRL, knowing that, if they did not, they would face vicarious liability for their supervisors' actions.

V.

A majority of the Court has departed once more from our mandate to "construe . . . the [NYCHRL] broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible" (*Albunio*, 16 NY3d at 477-478). As it did in *McGrath*, the majority rejects the plain language of the NYCHRL, declining—despite an expression of legislative intent that could hardly be clearer—to adopt the reasonable definition of employer that would be most favorable to discrimination plaintiffs. This error is particularly troubling because, unlike the *McGrath* Court, which did not have the benefit of the Court's opinion in *Albunio*, the majority today is entirely aware of our obligation to construe the statute in this way. Nonetheless, it refuses to do so.

A proper definition of "employer" would enforce the rule that every workplace— including those controlled by a limited partnership—is subject to the prohibitions of the NYCHRL. The NYCHRL holds owners accountable for discrimination and all employees

---

below, and so I take no position on the correctness of Supreme Court's interpretation of § 8-107 (6).

are subject to its protections, regardless of how owners structure their businesses.

Order affirmed, with costs. Opinion by Judge Garcia. Chief Judge DiFiore and Judges Stein, Fahey, Wilson and Feinman concur. Judge Rivera dissents in an opinion.

Decided February 11, 2021